IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **STEPHANI ESPINOZA,** | § § | |
| *Plaintiff*, | § § | CIVIL ACTION NO. _____ |
| v. | § § | |
| **CAREERSTAFF UNLIMITED, INC.** | § § | |
| *Defendant.* | § § § | **JURY DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Stephani Espinoza files this Original Complaint against Defendant CareerStafft, and in support states as follows:

### NATURE OF SUIT

1. <u>FMLA – Failure to Reinstate:</u>  After Plaintiff took protected FMLA leave, Defendant failed to restore her to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.

2. <u>FMLA – Retaliation for Past Leave & Interference with Future Leave:</u>  Defendant terminated Plaintiff's employment in retaliation for past FMLA-protected leave, and to prevent her from exercising her stated intention to take additional leave in the future.

3. <u>Pregnancy Discrimination Act:</u> (Pending administrative exhaustion). Defendant terminated Plaintiff's employment because of her stated intention to become pregnant, and to take maternity leave in the near future.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred on this Court by 28 U.S.C. §1331.

5. Venue is proper in this Court under 28 U.S.C. §1441(a). Venue is also proper in this district pursuant to 28 U.S.C. §1391(b)(1) and under 28 U.S.C. §1391(b)(2) because all or substantial part of the events or omission giving rise to the claim occurred in this district.

## PARTIES

6. Plaintiff Stephani Espinoza is a resident of Dallas, Texas. She is a former employee of the Defendant.

7. Defendant CareerStaff Unlimited, Inc. was Plaintiff's employer. It can be served with process via its registered agent, CSC, 211 E. 7th St., Ste. 620 Austin, TX 78701.

## FACTS

8. Ms. Espinoza began working as a nurse recruiting assistant for CareerStaff in January 2019. She was later promoted to the position of Recruiter, in September 2019.

9. On March 5, 2020, she requested intermittent FMLA leave in order to deal with her "chronic, intractable migraines" (this was the language provided by her neurologist on her FMLA paperwork). She submitted the proper documentation from her neurologist, and her request was approved.

10. Her FMLA documentation explicitly stated that her condition would: "...cause <u>episodic flare ups</u> periodically preventing the employee from performing [her] job functions." The company was put on notice, therefore, that this employee would require occasional, *unforeseeable* intermittent leave.

11. After that approval, Ms. Espinoza occasionally had to take a half or whole day off of work when a migraine attack occurred - as anticipated, and as approved.  But her supervisor began to openly express her frustration toward, and impatience with, Ms. Espinoza's need for occasional unforeseeable leave.

12. Around August 2020, Ms. Espinoza began seeing a doctor for her mental health, and that doctor prescribed her an antidepressant medication, which she began taking as prescribed. She informed her supervisor of this fact.

13. Then, on or around August 31st, 2020, she was hit with an awful migraine attack. She had to take her migraine medication to treat it.  This was on top of the new antidepressant medication she had recently begun, and she had an unexpected reaction to the medications.

14. The medication combination put Ms. Espinoza "out cold," and she slept until about 1:00pm the next day.

15. When she woke up, she immediately contacted her supervisor and explained what had happened.  The company, therefore, knew that this absence was caused by Ms. Espinoza's illness - indeed, it was the very issue for which she had already been given intermittent FMLA hours to use..

16. Rather than seeing this incident for what it was -- an unforeseeable FMLA leave event, which should have simply been counted toward her intermittent FMLA leave hours -- the company wrote her up for it.

17. Ms. Espinoza's supervisor, along with an H.R. representative, gave her a write-up on September 2, 2020.  The write-up expressly acknowledged that Ms. Espinoza "overslept <u>due</u>

to medications taken the night before." It nonetheless faulted her for her "Failure to provide (2) hour notice of an unscheduled tardy and absence."

18.   This action was a violation of the FMLA.  FMLA regulations make it clear that "an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances."

19.   The regulations recognize that there may be circumstances - like this one - when it is impracticable for an employee to comply with the employer's usual and customer notice requirements.  They state: "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."

20.   Ms. Espinoza did just that.  When she took her prescribed medications on August 31st, she did not know that she would be knocked-out until 1pm the next day.  But as soon as she was physically able to report to work about what happened, she did - giving her supervisor all of the information necessary for her supervisor to know that the "absence is potentially FMLA-qualifying."

21.   Despite this, nobody from the company acknowledged the applicability of the FMLA or the ADA to this situation.  Ms. Espinoza was written up for this incident, in direct contravention of the law:  "[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as...disciplinary actions; nor can FMLA leave be counted under no fault attendance policies." 29 CFR § 825.220.

22.   The write-up put Ms. Espinoza on a "30 day PIP," and stated that "failure to meet or exceed these expectations, or any display of gross misconduct will result in further disciplinary action, up to and including termination."  This document was the first write-up Ms.

Espinoza had received at CareerStaff. It should never have been given, as the precipitating event was an incident of legally protected leave.

23. 7 days after this write up was issued, Ms. Espinoza had to have surgery on her left foot. The surgery took place on September 11, 2020. After the surgery, she was in a cast, and unable to bear weight. She was also put on medications that made it very difficult to concentrate.

24. Due to previous pressures from her supervisor to minimize absences - not to mention the write up she had just received - Ms. Espinoza tried to resume work as usual. But it immediately became clear to her that she would not be able to perform her work while she was recovering from this surgery.

25. So, she immediately requested continuous FMLA leave in order to properly recover from the foot surgery.

26. Her request was approved on or around September 16, 2020, for a leave period of September 11th to December 12th, 2020.

27. At the time when she went out on leave, Ms. Espinoza had 18 traveling nurses under her, that she had recruited.

28. As you are no-doubt aware, having an established group of already-recruited nurses ("TNA's") is very important to a recruiter's success, and to her ability to build an ongoing "pipeline" of confirmed nurse contacts.

29. Multiple nurse recruiters have confirmed this fact. They've also confirmed that having an existing group of TNA's makes it easier for a recruiter to meet their daily and weekly dial and submission requirements. The established group of TNA's will refer their friends to the recruiter, and help the recruiter to confirm the correct contact information for others.

Case 3:21-cv-00878-E   Document 1   Filed 04/17/21   Page 6 of 12   PageID 6

30. When Ms. Espinoza was out on leave, all of her existing TNA's were reassigned to other recruiters. That's all well and good, for the period of her leave. But when Ms. Espinoza was ready to come back to work, the company would not reassign those TNA's back to her.

31. As a result, Ms. Espinoza had to start from scratch when she returned to work on Monday, December 14, 2020. This made it significantly more difficult for her to meet her required targets.

32. This action also violated the FMLA. On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence. 29 CFR §825.214.

33. An "equivalent position" is one with the same "benefits and working conditions, including privileges, perquisites and status," and one that requires the same level of "effort" as the job she held at the time the leave began. 29 CFR §825.215(a). The employee must also "have the same or an equivalent opportunity for bonuses, profit-sharing, and other similar discretionary and non-discretionary payments." 29 CFR §825.215(e)(3).

34. Ms. Espinoza was not returned to an "equivalent" position. Instead, she was put back in the position of a brand-new recruiter, starting over from scratch to build up a new pipeline of TNA's. This backward move made it more difficult for her to build up the income-generating business on which recruiters so heavily rely, and made it harder for her to meet her daily and weekly targets.

*Plaintiff's Original Complaint*   Page 6 of 12

35. To make matters worse, Ms. Espinoza returned to work during the holiday season, when many nurses were out on vacation, not actively seeking new placements, and not answering their phones or returning messages. As a result, it was extremely difficult for <u>all of the recruiters</u> - Ms. Espinoza included - to meet their usual targets.

36. The day after she returned to work, Ms. Espinoza informed Ms. Thomas that she planned to undergo IVF in 2021, and hopefully to get pregnant and build a family. Ms. Thomas reacted to this news only with concern about Ms. Espinoza's absences.

37. The next week, Ms. Espinoza was called to a zoom meeting with Akaiya Thomas for a dressing down. During that week, she had dealt with numerous technical issues, which resulted in her activity not being accurately tracked.

38. Ms. Thomas moved extremely quickly to give Ms. Espinoza a performance warning on December 23, 2020 - despite the fact that Ms. Espinoza: (a) had *just* returned from FMLA leave; (b) was still getting technical glitches worked out; (c) had had her accounts taken away from her, and was just getting started over from scratch; and (d) while she was having some trouble meeting some targets, it was the same trouble that many other recruiters were experiencing as a result of the holidays.

39. In her follow up e-mail to Ms. Espinoza on December 23rd, after talking about Ms. Espinoza's performance, Ms. Thomas included a warning about absences: "you already have an intermittent LOA in place regarding migraines. You took an early lunch on 12/21 for a doctor's appointment. You also had another doctor's appointment on 12/22." It was clear that Ms. Thomas was not pleased with the health related absences Ms. Espinoza had taken in the past.

40. Ms. Thomas' 12/23/2020 email concluded with the statement: "It's great to have you back on the team. Now the real work begins. You have to put in the activity every day to reach your goals. We believe you can do this and support you every step of the way."

41. There was no indication that Ms. Espinoza's job was on the line at that point in time. Instead, the plan appeared to be to make sure Ms. Espinoza could improve and move forward.

42. Even if Ms. Thomas had chosen to "pick up where she left off" with the 30-day PIP she had issued to Ms. Espinoza back in September, those 30 days wouldn't have run until January 14, 2021.

43. Nonetheless, Ms. Thomas fired Ms. Espinoza on December 28, 2020 - the very next business day[1] after her 12/23/2020 email ("We believe you can do this and support you every step of the way.").

44. Even if Ms. Espinoza had legitimately been having serious performance problems (an allegation she disputes, in that she had only been back a week, and *many* recruiters were having trouble with targets in light of the holidays, but they were not fired), she was never even given a chance to improve. She was fired almost immediately after return, right after she revealed the potential need for a future leave of absence.

---

[1] The office closed early on 12/24, and that morning was taken up by an office "Secret Santa" party. The office was closed 12/25 though 12/27.

## COUNT ONE:
## FMLA Interference by Failure to Reinstate

45. Plaintiff realleges and incorporates by reference all of the facts set forth in the above sections of this Complaint.

46. CareerStaff is an "employer" as defined by the FMLA. 29 U.S.C. § 2611(4).

47. During all relevant times, Plaintiff was an "eligible employee" under the FMLA, 29 U.S.C. § 2611(2)(A), 29 C.F.R. § 825.110.

48. Plaintiff's migraines, as well as her foot surgery and related medical treatment, were serious health conditions under the FMLA. 29 U.S.C. § 2611(a)(1)(D), 29 C.F.R. § 825.113, 29 C.F.R. § 825.114, and 29 C.F.R. § 825.115.

49. Plaintiff informed Defendant that she needed to take leave, and that she needed to do so for an FMLA-qualifying reason. 29 C.F.R. § 825.301(b).

50. Defendant failed to provide Plaintiff with an Eligibility Notice (as required by 29 USC 825.300(b)), a Designation Notice (as required by 29 USC 825.300(d)), or a Rights and Responsibilities Notice (as required by 29 USC 825.300(c)).

51. Defendant failed to return Plaintiff to the same position she held when leave commenced, or to an equivalent position with equivalent benefits, working conditions, privileges or status. The job she was returned to did not require the same level of effort as the job she held at the time the leave began. 29 CFR §825.215(a). And upon her return, she did not have an equivalent opportunity for bonuses, profit-sharing, and other similar discretionary and non-discretionary payments. 29 CFR §825.215(e)(3).

52. Defendant's failure to reinstate Plaintiff to an equivalent position made it more difficult for her to build up the income-generating business on which recruiters so heavily rely, and made it harder for her to meet her daily and weekly targets.

53. Defendant relied on these difficulties when it decided to terminate Plaintiff's employment - so that the failure to properly reinstate directly led to the loss of Plaintiff's job..

54. Plaintiff requests that she be awarded all damages to which she is entitled, as outlined in 29 U.S.C. § 2617, including but not limited to: all lost wages and employee benefits, liquidated damages, pre-judgment interest, and post-judgment interest.

55. Plaintiff also requests reinstatement (or adequate front pay in lieu of reinstatement), injunctive relief to prevent further FMLA violations, and any additional equitable or other relief to which she may be entitled.

56. Plaintiff also seeks recovery of her reasonable attorney's fees and court costs.

## COUNT TWO:
## FMLA Wrongful Termination
## (Retaliation for Past Leave + Interference with Future Planned Leave)

57. Plaintiff realleges and incorporates by reference all of the facts set forth in the above sections of this Complaint.

58. Defendant fired Plaintiff because of the FMLA-covered absences and leave that she took during 2020.

59. Further, Defendant interfered with Plaintiff's FMLA rights under 29 U.S.C. 2615(a)(1) by terminating Plaintiff to prevent her from exercising her right to take additional FMLA leave.

60. Plaintiff requests that she be awarded all damages to which she is entitled, as outlined in 29 U.S.C. § 2617, including but not limited to: all lost wages and employee benefits, liquidated damages, pre-judgment interest, and post-judgment interest.

61. Plaintiff also requests reinstatement (or adequate front pay in lieu of reinstatement), injunctive relief to prevent further FMLA violations, and any additional equitable or other relief to which she may be entitled.

62. Plaintiff also seeks recovery of her reasonable attorney's fees and court costs.

## JURY DEMAND

63. Plaintiff requests trial by jury.

## PRAYER FOR RELIEF:

WHEREFORE, Plaintiff seeks judgment against Defendant for the following

A.  an Order finding Defendant liable for Plaintiff's actual damages, including lost wages and benefits (both back pay and front pay), the sum to be determined at time of trial as a result of Defendant's FMLA violations;

B.  an Order finding Defendant liable for liquidated damages in an amount equal to Plaintiff's lost wages, plus interest as a result of Defendant's FMLA violations;

C.  an order that Defendant take such other and further actions as may be necessary to redress Defendant's violations of the FMLA, including, if applicable, reinstatement to Plaintiff's former position (or front pay if reinstatement not feasible);

D.  an Order awarding Plaintiff the costs of this action;

E.  an Order awarding Plaintiff her attorney's fees;

F.  an Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

G.  an Order granting such other and further relief as may be necessary and appropriate.

*Respectfully Submitted,*

Tremain Artaza PLLC

By: */s/ Ashley Tremain*
    Ashley E. Tremain
    State Bar No. 24066209

13140 Coit Road, Ste. 104
Dallas, Texas 75240
Telephone: (469)-573-0229
Facsimile: (214)-254-4941
ashley@tremainartaza.com

**COUNSEL FOR PLAINTIFF**